## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

ERIN NESSMITH and JARED NESSMITH,
individually, and as guardians of their minor child,
A.N., on behalf of themselves and      CLASS ACTION COMPLAINT
on behalf of those similarly      CLASS REPRESENTATION
situated,

       Plaintiffs,              DEMAND FOR JURY TRIAL

JUUL LABS INC., ALTRIA GROUP,
INC., and PHILIP MORRIS USA, INC.,

       Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Plaintiffs, Erin NesSmith and Jared NesSmith, individually, and as legal guardians of their minor child, A.N., by and through their undersigned counsel, bring this class action complaint against Defendants JUUL Labs, Inc., Altria Group, Inc., and Philip Morris USA, Inc., on behalf of themselves and those similarly situated, and allege as follows:

### INTRODUCTION

2.      A.N. is only 15 years old yet she is addicted to JUUL, an e-cigarette. She also suffers from seizures, a known complication of nicotine ingestion. The federal Food & Drug Administration (FDA) just announced it was studying the association between seizures and e-cigarettes. Health authorities consider youth e-cigarette use an epidemic. Defendants are to blame. Mimicking Big Tobacco's past marketing practices, Defendants prey on youth to recruit replacement smokers for financial gain. Tobacco giant Altria recently acquired a 35% stake in JUUL, the country's lead e-cigarette seller. Altria also owns Philip Morris, which sells Marlboro, the country's most popular cigarette. Now that JUUL has Altria's infrastructure, progress in nicotine cessation stands to erode. Defendants use the very fraudulent and deceptive

youth marketing business practices adjudged to violate federal racketeering laws.  They exploit

themes that resonate with teenagers while falsely denying doing so:



Plaintiffs bring this lawsuit to redress the harm already sustained and to prevent future harm to

others.

**PARTIES, JURISDICTION, AND VENUE**

3.      Plaintiffs, Erin NesSmith and Jared NesSmith are the parents and natural

guardians of A.N.  Plaintiffs reside in Sarasota County, Florida, and are citizens of the State of

Florida.  A.N., who is 15 years old, began using and purchasing JUUL vaping products when she

was 14.  A.N. was unaware that JUUL contained nicotine when she first began "JUULing."

A.N. still does not know how much nicotine JUUL contained or that JUUL was specifically

developed to create and sustain a nicotine addiction.  A.N. was attracted to and most often used

the mango flavor.  A.N. is addicted to the nicotine contained in JUUL.  A.N. has, at times,

experienced seizures after using JUUL.  A.N. would sometimes unintentionally swallow the e-

liquid nicotine contained in JUUL.  A.N. was directly and proximately harmed by Defendants'

unlawful conduct as alleged in this complaint.  Such harm includes exposure to significant toxic

substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that she would not have purchased JUUL had known the true facts.

4.      Plaintiffs did not know that JUUL was an e-cigarette device when Ms. NesSmith first saw the product in A.N.'s school backpack.  Instead, they thought it was a USB drive for a computer.  Now that they know that JUUL is a nicotine delivery device and are aware of their daughter's "JUULing" history, they are concerned about their daughter's health and for her future health because of the known complications associated with nicotine usage.  Plaintiffs are also concerned for their children's well-being.  Plaintiffs reasonably fear that the Defendants listed below are working in concert to market and advertise JUUL to youth and teenagers and that Defendants' association and marketing efforts increase the likelihood that their minor children will begin using e-cigarettes and become addicted.  Unless these Defendants are enjoined from their unlawful acts as described below, the harms will continue as their family members will continue to be exposed to their deceptive youth marketing campaigns.

5.      Defendant JUUL Labs, Inc. ("JUUL"), is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc.  JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes.

6.      Defendant, Altria Group, Inc. ("Altria"), is a Virginia corporation, having its principal place of business in Richmond, Virginia.

7.      Defendant, Philip Morris USA, Inc. (Philip Morris), is a wholly-owned subsidiary of Altria.  Philip Morris is a Virginia corporation, having its principal place of business in Richmond, Virginia.  Philip Morris is engaged in the manufacture and sale of cigarettes in the United States.  Philip Morris is the largest cigarette company in the United States. Marlboro, the

principal cigarette brand of Philip Morris, has been the largest-selling cigarette brand in the United States for over 40 years.

8.     Altria and Philip Morris are referred to collectively as the Altria Defendants. Altria acquired 35% ownership in JUUL to, among other things, sell, promote, market, and distribute JUUL e-cigarettes.  Pursuant to a services agreement, JUUL will have access to Altria Defendants' industry infrastructure.

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims arise under federal law. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

10.     The Court has personal jurisdiction over all Defendants because they do business in the Middle District of Florida and have sufficient minimum contacts with this District.  Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, and sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Florida law and the U.S. Constitution.

11.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## GENERAL FACTUAL ALLEGATIONS

### A.  The E-Cigarette Epidemic

12.     According to the CDC, about 4.9 million middle and high school students were current users of a tobacco product in 2018, meaning that they used such products within the past 30 days.  This represents an increase of 1.3 million users just since 2017.[1]

13.     A surge in e-cigarette use explains this dramatic increase:  There were 1.5 million more youth e-cigarette users in 2018 than 2017, accounting for more than the full increase in youth tobacco usage and erasing past progress in reducing youth tobacco product use.  E-cigarette use among U.S. high school students increased more than 900% from 2011 to 2015.  Frequent use of e-cigarettes increased from 20 percent in 2017 to 28 percent in 2018. E-cigarette use in general increased 78 percent among high school students and 48 percent among middle school students from 2017 to 2018.  As CDC Director Dr. Robert R. Redfield explains: "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."

14.     Many youth tobacco product users are also using multiple tobacco products: a combination of e-cigarettes and conventional cigarettes.

15.     The FDA characterizes teen vaping as an epidemic.  And with good reason:  Smoking is the leading cause of preventable death. Cigarette smoking causes about one in every five deaths in the United States each year.  This amounts to around 480,000 deaths annually.  If smoking continues at the current rate among U.S. youth, 5.6 million of today's Americans younger than 18 years of age are expected to die prematurely from a smoking-related illness.  This represents about one in every 13 Americans aged 17 years or younger who are alive today.

---

[1] *See* https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

16.     A study done by the American Journal of Medicine found that among young adults who did not smoke cigarettes, those who used e-cigarettes were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months.[2]

17.     JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

18.     Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung diseases.

19.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[3] Big Tobacco has long known that nicotine addiction is the reason for tobacco product usage.

**B.  The JUUL E-Cigarette**

20.     Since its launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the United States.  Its revenues grew by 700% in 2017.  According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.[4]

---

[2] Primack, Brian A. MD, PhD. "Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults." The Am. J. of Medicine. November 2017.
[3] See https://www.ncbi.nlm. nih.gov/books/NBK53018/#ch4.s92
[4] https://www.durbin.senate.gov/imo/media/doc/FINAL%20JUUL%20Letter%204.8.19.pdf

21.     JUUL is a novel cartridge-based e-cigarette design.  The cartridges are called pods or JUULpods. JUUL devices heat up a cartridge containing oils to create vapor, which quickly dissolves into the air. JUUL describes the e-cigarettes as an "easy to use vaporizer."

22.     The JUUL e-cigarette is a sleek, high-tech design.  It looks like a USB flash drive, and it can charge in a computer. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand.  JUUL is easy to conceal from parents and teachers.  The odor emitted from JUUL is a reduced aerosol – unlike the distinct smell of conventional cigarettes.

23.     The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

24.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls amount of nicotine vapor delivered. Studies show that there is a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."  See Duell, James F. Pankow, and David H.

Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431 (2018) ("the Duell study").

25.     JUUL designed its products to replicate the "feel" of traditional cigarettes, and this design makes it easier for e-cigarette users to transition to conventional cigarettes because of the similarity.  Indeed, JUUL says its devices "mirror the simplicity that smokers are accustomed to."[5]

26.     The JUUL e-cigarette is defectively designed and therefore unreasonably dangerous.  JUUL is designed to create and sustain a nicotine addiction.  JUUL appears to deliver nicotine more effectively and at higher doses than other e-cigarettes, increasing users' risk of addiction.  JUUL's patented JUULSalts approach to nicotine delivery is due to compounds called nicotine salts, which develop in heat-dried tobacco leaves much like most cigarettes.  According to the company website, freebase nicotine is mixed with benzoic acid to make the e-liquid, which has a chemical reaction to produce the nicotine salts. JUULPod e-liquid cartridges contain up to twice the amount of nicotine as a pack of cigarettes and are easier to inhale. This design method increases JUUL's inhale-ability. The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth." *Id*. 433

27.     Moreover, the JUUL device does not have a manual or automatic "off" switch. Neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limits the amount of nicotine JUUL delivers in each puff to the upper bound of a cigarette.

---

[5] *See* https://support.juul.com/home/learn/faqs/juul-device-basics (last visited Apr. 9, 2019)

28.     JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users.

29.     JUUL delivers doses of nicotine that are materially higher than combustible cigarettes. The United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine).[6] JUUL's nicotine concentration is 59 mg/ml, which is in a salt form that increases the rate and efficiency of nicotine delivery. JUULpods therefore exceed the nicotine dose of a traditional cigarette.

30.     Comparison of available data regarding per-puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 3 (the "Reilly study"). The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms (µg) of nicotine per puff. Reilly et al. Free Radical. See Appendix B, Chart 7. Reilly's findings were based on a puff volume of 75/ml. By comparison, a 2014 study using larger, 100 ml puffs found that a Marlboro cigarette delivered 152—193 µg/puff. M.J. Schroeder and A.C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control 2014; 23:ii30-ii35. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff,

---

[6] E-Cigarettes, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited Apr. 9, 2019).

a Marlboro would deliver between 114 and 144 µg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

31.     Adding to the above defects, JUUL is also defective in design because it puts e-cigarette users, especially youth or young adults with developing brains, at greater risk of experiencing seizures.[7] JUUL's design for nicotine delivery, nicotine content, nicotine formulation and their effects on creating or sustaining nicotine addiction increases the propensity of abnormal electrical activity in the brain.  JUUL is further defectively designed in that its users may unwittingly swallow the e-liquid.  These defects can cause or substantially contribute to causing mild or major seizures.  The FDA is currently investigating reports of youth and young adults who are experiencing seizures following the use of e-cigarettes.

**B. JUUL Fraudulently Concealed Important Safety Information On How Addictive It's E-Cigarettes Are**

32.      JUUL has fraudulently concealed material information about the addictive nature of its e-cigarettes.  Plaintiffs' claims arise out of JUUL's fraudulent concealment of material facts concerning the JUUL e-cigarette and representations about the JUUL e-cigarettes' nicotine content, its addictiveness, and the physiological effects of JUUL e-cigarettes.

33.     At all relevant times, JUUL knew that JUUL e-cigarettes' were not safe for non-smokers, and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes. JUUL was under a duty to disclose this material information based upon its exclusive knowledge of it, and its concealment of it; yet JUUL never disclosed the defect to Plaintiff or the public.

34.     JUUL repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes. For example, some JUUL advertisements and

---

[7] https://www.fda.gov/TobaccoProducts/NewsEvents/ucm635133.htm

JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." This falsehood is recast in JUUL advertisements, and on JUUL's website, into the claim that a JUUL delivers about as much nicotine as a cigarette.

35.     This statement is false because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect and risk of addiction. Defendants know that benzoic acid affects pH and "absorption of nicotine across biological membranes."[8]

36.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is false and likely to mislead, because the amount of nicotine *contained* in the JUULpod is perhaps six times less than in a pack of cigarettes, but actual amount of nicotine *consumed* via JUULpod is as much as twice as high as that via cigarettes.

37.     Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018.

38.     JUUL has not been approved as a smoking therapy nor has it been approved as a modified risk tobacco product.

39.     JUUL fails to inform users that its products have <u>not</u> been found to be safe and effective by the FDA for the purpose of smoking cessation.

## C.  JUUL Copied Big Tobacco's Youth Marketing Playbook To Addict Youth to Nicotine

---

[8] Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Handbook of Experimental Pharmacology 1982: 29-60 (Oct. 13, 2010), available at: HYPERLINK "https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/[8] https://www.fda.gov/TobaccoProducts/NewsEvents/ucm635133.htm

40.     JUUL adopted the same themes used by Philip Morris and other Big Tobacco companies in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

41.     Statements by JUUL's founder and employees make clear JUUL's intent to develop a highly addictive product to sell to a new audience of non-smokers. James Monsees, one of JUUL's founders, described the cigarette as "the most successful consumer product of all time . . . . an amazing product." According to Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

42.     JUUL used the tobacco industry's prior practices as a playbook. Monsees admitted publicly that JUUL began by looking at tobacco industry documents, including board meeting minutes. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

43.     JUUL's research included documents about how tobacco companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."

44.     JUUL also used tobacco industry advertisements—which were created to lure nonsmoking youth—as a guide to JUUL's own advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them." Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019).

45.     These copycat advertising and marketing practices include: colorful ad campaigns using eye-catching designs and youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that the JUUL e-cigarettes are "great tasting," etc.  Viral marketing campaigns push JUUL products on children, teens, and young adults. For example, it is suspected that JUUL pays social media stars or social media influencers to flood social media newsfeeds with JUUL promotion – Big Tobacco did the same type of product placement to create viral campaigns of smoking. Like Big Tobacco before it, JUUL distributed free e-cigarette and packs at live social events.

46.     JUUL's original marketing campaign included billboards, YouTube videos, advertising in magazines, like VICE Magazine, launch parties, and a sampling tour.

47.     One study of JUUL's marketing showed that "the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms…JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market its products."[9]  The study further found that JUUL's Instagram account reached a quarter million followers, used artsy photographs to display its products and "evoke lifestyle feelings such as relaxation, freedom and sex appeal."

48.     The Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18.

---

[9] Huang, J, et al., "Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail, available at
https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2018/05/31/tobaccocontrol-2018-054382.full.pdf.

49.     JUUL has also played off the ubiquity of Apple products such as iPhones and iPads.  JUUL promotes itself with statements like JUUL is "the iPhone of e-cigarettes," which JUUL posted on its website and used as the basis for a social media and email campaign.

50.     JUUL is available in sweet flavors including mango, fruit medley and cool mint. According to one survey, 81 percent of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.[10]

51.     JUUL's viral marketing campaign has been successful.  The National Youth Tobacco Survey has found that 78.2 percent of middle and high-school students – 20.5 million youth – had been exposed to e-cigarette advertisements.

52.     JUUL has styled itself as something different than Big Tobacco.  For example, JUUL had a campaign that expressly stated: "FACT: JUUL Labs is not Big Tobacco.  We are an independent vapor company on a mission to eliminate cigarettes."  That has proved false.  As discussed below, Altria acquired 35% of JUUL to partner with the company.

**D.  Philip Morris, An Altria Subsidiary, Has a Long History of Marketing Tobacco Products to Youth**

53.     Beginning in the 1950s through the present, Philip Morris intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.  *See U.S. v. Philip Morris, et al.*, No. 99-cv-2496, Amended Final Opinion at page 972 (D.D.C. Aug. 17, 2006) (Kessler, J.).

54.     Philip Morris knew that marketing cigarettes to youth is essential to the company's success and longevity, and for that reason, it created marketing campaigns to increase youth consumption.

---

[10] Villanti AC, Johnson AL, Ambrose BK, et al. Use of flavored tobacco products among U.S. youth and adults; findings from the first wave of the PATH Study (2013-2014)

55.     An internal memorandum dated March 31, 1981 sent by Myron Johnston, a marketing researcher for Philip Morris, states: "It is important to know as much as possible about teenage smoking patterns and attitudes.  Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens." *See* Young Smokers: Prevalence, Trends, Implications, and Related Demographic Trends, p. 6.

56.     To accomplish this sordid goal, Philip Morris tracked youth behavior and preference; employed marketing themes that resonated with youth; and promoted cigarettes to youth through retail promotions, events and sponsorships. *See U.S. v. Philip Morris, et al.*, at pages 1006, 1072.

57.     Philip Morris intentionally exploited adolescents' vulnerability to imagery by creating advertising that utilizes the themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being "cool."  Philip Morris' marketing tactics consistently reached millions of teens.  *Id.* at page 990

58.     Philip Morris' youth brand is Marlboro, which was and remains among the most heavily advertised brands.  *Id.*, at pages 980, 991.

59.     Philip Morris was adjudged to have engaged in unlawful coordinated activity to "recruit new, youth smokers through cigarette marketing," and falsely denied that it marketed to youth.

60.     The Racketeering Acts associated with Philip Morris' youth marketing consisted of advertisements that appeal to and target youth, the designs of which are based on its research on teenage behaviors and preferences.  *Id.*, at page 1519.

61.    The Altria Defendants have not abandoned their youth-appealing themes.  Up until it acquired a 35% stake in JUUL, described below, Altria Defendants had their own e-cigarette, the MarkTen products, which Altria conceded was popular among youth.

**E.    The Government Takes Action to Address the E-Cigarette Epidemic**

62.    On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of JUUL products among youth.  The FDA ordered JUUL to submit documents regarding its marketing practices.  The FDA publicized this letter on its website.

63.    On September 12, 2018, the FDA sent letters to five e-cigarette manufacturers that represent more than 97 percent of the current market.  JUUL and Altria were among these manufacturers.  The FDA commissioner, Dr. Gottlieb, stated these companies are "now on notice by the FDA of how their products are being used by youth at disturbing rates."  Further, the FDA requested "the manufacturers of these brands and products to come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors."  Dr. Gottlieb ordered the companies to "demonstrate that they're truly committed to keeping these [e-cigarettes] out of the hands of kids and they must find a way to reverse this trend."

64.    On October 4, 2018, JUUL stated it released 50,000 pages of documents to the FDA and that it "want[s] to be part of the solution in preventing underage use."

65.    On October 18, 2018, Altria's CEO met with members of the FDA leadership. During that meeting, Altria acknowledged it had an obligation to address the epidemic of youth use of e-cigarettes.

66.    Publicly, and in response to the FDA's alarm concerning the rise in youth e-cigarette use, Altria's CEO, Howard Willard, stated, in letter to the FDA of October 25, 2018, that

the company is "alarmed about the reported rise in youth e-vapor use to epidemic levels."  Mr.

Willard further wrote that Altria believed that pod-based products significantly contributed to the

rise in youth use of e-vapor products and committed to "remove from the market our *MarkTen*

*Elite* and *Apex by MarkTen* pod-based products until we receive a market order from FDA or the

youth issue is otherwise addressed."  Mr. Willard also wrote: "We are committed to helping

reverse the current [vaping] use and trend among youth."

67.     On November 14, 2018, JUUL announced a plan to combat underage use.

68.     A day later, on November 15, the CDC announced that e-cigarette use in general

increased 78 percent among high school students and 48 percent among middle school students

from 2017 to 2018.  The FDA Commissioner called these results "astonishing."

69.     On December 7, 2018, Altria announced it would discontinue production and

distribution of all MarkTen products and said it will "refocus its resources on more compelling

reduced-risk tobacco product opportunities."

70.     On December 18, 2018, the Secretary of the U.S. Department of Health and Human

Services, Alex Azar, stated at a press conference: "We have never seen use of any substance by

America's young people rise as rapidly as e-cigarette use is rising."

**F.  Altria Defendants Long-Monitored JUUL's Growth And Recently Purchased a
     Controlling Stake to Partner With JUUL**

71.     Altria's public stance on e-cigarettes markedly differed from its private

undertakings with respect to JUUL.

72.     The Altria Defendants closely and carefully monitored the details of JUUL's

business for years prior to its decision to buy into JUUL in December 2018.  In an earnings call of

December 2018, Altria Defendants stated that they had been in talks with JUUL's managers for

"quite some time."  Altria's chief executive, Howard Willard, stated: "we've been monitoring [JUUL's] growth…for three years" – in other words, since JUUL launched back in 2015.

73.      Altria's disclosures to the Securities and Exchange Commission reveal it had been "closely" following JUULs journey to "see if it had staying power."

74.      Weeks after Altria announced it would remove its e-vapor products from the market to address the youth vaping epidemic, on December 20, 2018, Altria made public that it closed a $12.8 billion investment with JUUL, the leader in e-cigarettes, amounting to a 35% stake.  Thus, Altria is continuing to sell flavored e-cigarettes, which it told the FDA it would stop.

75.      Altria agreed to a non-competition obligation with JUUL as long as Altria is providing services to JUUL, which Altria has committed to doing for at least six years.

76.      Altria and JUUL also entered into a services agreement. Among other things, Altria will provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping prevention, cigarette pack inserts and onserts, regulatory matters and government affairs. Altria has also agreed to grant JUUL a non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field, subject to the terms and conditions set forth in an intellectual property license agreement between the parties.

77.      Pursuant to the agreement Altria has agreed to provide JUUL with certain commercial services on a cost-plus-3% basis for an initial term of six years.

78.      Pursuant to the agreement Altria will provide JUUL access to its prime retail shelf space, which will allow JUUL products to appear alongside Philip Morris combustible cigarettes like Marlboro, the country's most popular cigarette brand.  Altria will also provide JUUL,

through the Altria Group Distribution Company, sales and distribution services and thus: access to Altria's near 230,000 retail locations.

79.     Pursuant to the agreement, Philip Morris, which maintains a database of cigarette smokers' mailing and email addresses, will send JUUL advertising and marketing messages to its customers.

80.     Further, pursuant to the agreement JUUL will benefit from Altria's influence with legislators and regulators and the expertise of Altria's legal team in countering tobacco litigation.

81.     At a conference call on December 20, 2018, Altria's CEO remarked that Altria felt "fortunate to be the tobacco company that's partnered up with JUUL" and that Altria would provide its infrastructure to JUUL in order to accelerate JUUL's growth.  During that call, Altria said it would continue to market conventional cigarettes "vigorously."

82.     According to Robert K. Jackler, MD, Principal Investigator of the Stanford Research into the Impact of Tobacco Advertising: "The joining of JUUL and Marlboro brings together the two dominant players in the teenage nicotine addiction market (e-cigarette & cigarette).  This powerful combination constitutes a clear and present danger to the youth of America as well as those around the world."

83.     Studies demonstrate that e-cigarette use is associated with increased risk for cigarette initiation and use, particularly among low-risk youths. See Berry KM, Fetterman JL, Benjamin EJ, et al. Association of Electronic Cigarette Use With Subsequent Initiation of Tobacco Cigarettes in US Youths. *JAMA Netw Open.* 2019;2(2):e187794. doi:10.1001/jamanetworkopen.2018.7794.

84.     Recent promotional practices of both companies suggest that they may pursue a strategy by which youth start with JUUL and graduate to Marlboro:









 

 
















Original JUUL Design          Recent JUUL Design



**Leading Youth Cigarette Initiation Brand**



**Leading Youth e-Cigarette Initiation Brand**

## CLASS REPRESENTATION ALLEGATIONS

85.     Plaintiffs bring this class action against Defendants on behalf of themselves and

all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure.  The proposed classes are defined as follows:

> All persons who purchased, in the United States, JUUL products;
>
> All residents of Florida who purchased JUUL products;
>
> All residents of Florida who, at the time of their use of JUUL products, were under the age of 18, and who procured and used JUUL products.
>
> All legal guardians of United States residents who, at the time of their use of JUUL products, were under the age of 18, and who procured and used JUUL products
>
> All legal guardians of Florida residents who, at the time of their use of JUUL products, were under the age of 18, and who procured and used JUUL products.

86.     Plaintiffs reserve the right to propose subclasses or modify the above class

definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

87.     This action has been brought and may properly be maintained as a class action

against the Defendants pursuant to the provisions of Rule 23 of the Federal Rules of Civil

Procedure because there is a well-defined community of interest in the litigation and the

proposed classes are ascertainable.

88.     Numerosity: Plaintiffs do not know the exact size of the Classes but they are each

composed of more than 500 persons.  The persons in the Classes are so numerous that joinder of

all such persons is impracticable and the disposition of their claims in a class action rather than

in individual actions will benefit the parties and the courts.

89.     Commonality: There are questions of law or fact common to the Class or Classes

that predominate over any questions affecting only individual members, including:

a. Whether Defendants engaged in unlawful, unfair or deceptive business practices, as alleged herein;

b. Whether Defendants made unlawful and misleading representations or material omissions with respect to JUUL products;

c. Whether Defendants unlawfully marketed JUUL to minors;

d. Whether Defendants have been unjustly enriched by their conduct;

e. Whether Plaintiffs and class members are entitled to equitable and injunctive relief;

f. Whether punitive damages should be awarded.

90.    Typicality: Plaintiffs' claims are typical of the claims of the class.  Plaintiffs and class members were injured through Defendants' substantially uniform misconduct.  Plaintiffs are advancing the same claims and legal theories on behalf of themselves and class members, and there are no defenses that are unique to Plaintiffs' claims.  Plaintiffs' and class members' claims are from the same set of operative facts and are based on the same legal theories.

91.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the class.  Plaintiff has retained competent and capable attorneys experienced in complex and class action litigation, including consumer class actions.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resourced to do so.  Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with the class.

92.    Predominance: The common issues that comprise the basis for this lawsuit predominate over any individual issues.  Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

93.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy because, absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations of their legal obligations will continue without remedy, additional consumers will be harmed, and Defendants will continue to retain ill-gotten gains; it would be a substantial hardship for most individual class members if they were forced to prosecute individual actions; once liability has been adjudicated, the Court will be able to determine the claims of all class members; a class action will permit an orderly and expeditious administration of the claims, foster economies of time, effort and expense, and ensure uniformity of decisions; the lawsuit presents no difficulties that would impede its management by the Court as a class action; and Defendants acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of the Racketeer Influenced and Corrupt Organizations Act,
18 U.S.C. § 1962(c)
(On Behalf of All Classes)**

94.     Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein, and further declare:

95.     Defendants are all "persons" under 18 U.S.C. § 1961(3).

96.     Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of a RICO Enterprise through a pattern of racketeering activity.

97.     Since at least as long as JUUL and the Altria Defendants entered into an agreement with respect to JUUL e-cigarettes, and continuing up to and including the date of the filing of this complaint, Defendants have constituted an "enterprise" as the term is defined in 18

U.S.C. § 1961(4), that is, a group of business entities and individuals associated in fact, which is engaged in, and the activities of which affected, interstate commerce and foreign commerce. Each Defendants participates in the operation and management of the Enterprise.

98.     The Enterprise is functioning to achieve shared goals through unlawful means including to deceive consumers, particularly parents and children, by claiming that they did not market to children, while engaging in marketing and advertising with the intent of addicting children into becoming lifetime nicotine users.

99.     The RICO Enterprise has an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

100.     While Defendants participated in the conduct of the RICO Enterprise, they have an existence separate and distinct from the RICO Enterprise.

101.     At all relevant times, Defendants operate, control or manage the RICO Enterprise through a variety of actions.  The participation of Defendants in the RICO Enterprise is necessary for the successful operation of their scheme to market the JUUL nicotine device to children, which is the common purpose of the RICO Enterprise.

102.     At all relevant times, Defendants conducted and participated in the conduct of the affairs of the RICO Enterprise through a pattern of racketeering activity that consists of numerous and repeated violations of federal mail and wire fraud statutes.  These statutes prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

103.     As detailed in the General Factual Allegations, Defendants know that marketing JUUL e-cigarettes to youth is essential to Defendants' success and longevity, and for that reason,

they partnered to create marketing campaigns to increase youth consumption, while fraudulently denying they are doing so.  Defendants have furthered this scheme to profit.

104.    To carry out, or attempt to carry out the scheme to defraud, the Defendants have conducted or participated in the conduct of the affairs of the RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

    a. The Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Defendants' websites, communications with the FDA, statements to the press, and communications with other members of the RICO Enterprise, as well as advertisements and other communications to JUUL users; and

    b. The Defendants utilize the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

105.    The Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and class members were directly harmed as a result of the Defendants' intentional conduct. Plaintiffs, class members, among others, relied on the Defendants' material misrepresentations and omissions concerning their fraudulent statement with respect to targeting children.

106.    The predicate acts all had the purpose of generating significant revenue and profits for the Defendants at the expense of Plaintiffs and Class Members.

107.    The Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiff and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive and equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c). Equitable relief is necessary to ensure an end to Defendants' continued effort to deceptively campaign to induce children and minors to become addicted and subject to a high risk of disease.

## SECOND CAUSE OF ACTION

### Fraud
### (On Behalf of All Classes)

108.    Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

109.    At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue.

110.    Defendants also fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUULpod refills.

111.    Defendants further fraudulently and deceptively failed to disclose to Plaintiffs that JUUL is designed to create and sustain an addiction to nicotine.  Defendant also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiffs. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

112.    Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts

that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod.

113.    Defendants had a duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendant breached its duty to each of them. Defendant also gained financially from, and as a result of, its breach.

114.    Defendants concealed material information at all times relevant to this Complaint. Defendants have yet to disclose the truth about JUUL e-cigarettes.

115.    Plaintiffs, and those similarly situated, relied to their detriment on Defendant's fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would not have purchased or used JUUL products.

116.    Plaintiffs and class members were harmed directly and proximately by Defendants' fraud.  Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' fraud.

117.    Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiff, and those similarly situated.

### THIRD CAUSE OF ACTION

### Strict Product Liability – Failure to Warn
### (On Behalf of All Classes)

118.    Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

119.     Defendants manufactured, distributed and sold and promoted JUUL, or have partnered to manufacture, distribute, sell and promote JUUL.

120.     At all times relevant, Defendants were well-aware of the dangers of nicotine addiction as described in this complaint.

121.     At all times relevant, Plaintiffs and members of the Class were not aware of and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant JUUL has intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.  Since the Altria Defendants partnered with JUUL, they too intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

122.     In all forms of advertising as well as social media communications, Defendants failed adequately to warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendants failed adequately to warn in their advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendants marketed their products to minors and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability and increased the level of nicotine that is absorbed by users, making them even more addictive.

123.     The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

124.     The JUUL devices and pods were expected to be used by Plaintiffs and the class without substantial change in their condition from the time of their manufacture or sale.

125.     Plaintiffs and class members were harmed directly and proximately by Defendants' failure to warn.  Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' failure to warn.

## FOURTH CAUSE OF ACTION

### Strict Product Liability – Design Defect
### (On behalf of all Classes)

126.     Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

127.     Defendant JUUL designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by JUUL to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.  Since the Altria Defendants partnered with JUUL, they have assisted with one or more of these activities.

128.     Defendants knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including the Plaintiffs and members of the class.

129.     As described in this complaint, Defendants designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product.

130.    JUUL products are also inherently defective because they contain and deliver significantly more nicotine than JUUL represents.  Moreover, JUUL is unreasonably dangerous and therefore defective in design because it is made to create and sustain addiction.  The risks inherent in the design of JUUL outweigh significantly any benefits of such design.

131.    At all relevant times, Defendants could have employed reasonably feasible alternative designs to prevent the harms discussed in the complaint.

132.    At all relevant times, Plaintiffs and the class were unaware of the design defects described in the complaint.  Further, Defendants knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

133.    Plaintiffs and class members were harmed directly and proximately by Defendants' defectively designed JUUL e-cigarette.  Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium as a result of Defendants' defective products.

### FIFTH CAUSE OF ACTION

#### Negligence
#### (On behalf of all Classes)

134.    Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

135.    Defendants had a duty and owed a duty to Plaintiffs and the class to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not

target minors; ensuring that JUUL devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product.

136.    Defendants knew the risks that minors would be attracted to their electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

137.    Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard Plaintiffs and the other class members from the sale and/or distribution of electronic cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

138.    Defendants breached the duties they owed to Plaintiffs and class members.

139.    But for Defendants' duties and breaches thereof, Plaintiffs and Class members would not have been harmed as alleged in the Complaint.

140.    Plaintiffs and class members were harmed directly and proximately by Defendants' negligence.  Such harm includes significant exposure to toxic substances, which may cause or contribute to causing disease; nicotine addiction; and economic harm in that they would not have purchased JUUL or would have paid less for it if they had known the true facts and that they had paid a premium because of Defendants' negligence.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### (On behalf of all Classes)

141.     Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

142.     As described in the complaint, Defendants knowingly sold or partnered to sell JUUL Products to Plaintiffs and members of the Class in a manner that was unfair, unconscionable, and oppressive.

143.     As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiffs and the class.

144.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits it received from Plaintiffs and class Members. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the class for the monies paid to Defendants for its defective JUUL products.

## SEVENTH CAUSE OF ACTION

### Violation of Florida's Deceptive and Unfair Trade Practices Act,
### Fla. Stat. § 501.203
### (Brought on behalf of the Florida classes)

145.     Plaintiffs incorporate by reference paragraphs 1-93 above as if fully set forth herein and further declare:

146.     The express purpose of FDUTPA is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

147.     FDUPTA §501.204(1) declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

148.     Manufacturing, selling, promoting e-cigarettes in interstate commerce are "consumer transaction[s]" in the scope of FDUPTA, and JUUL is a good within the meaning of that statute.

149.     Plaintiff is a "consumer" as defined by FDUPTA § 501.203.

150.     Defendants' unfair and deceptive practices are likely to mislead – and have misled – reasonable consumers, such as Plaintiff and members of the class, and therefore, violate Section 500.04, Florida Statutes

151.     Defendants have engaged and continue to engage in unfair, unlawful, and deceptive trade practices in Florida as outlined herein.  In particular, Defendants have knowingly developed, sold, and promote a product that contained nicotine levels in excess of cigarettes with the intention of creating and fostering long-term addiction to JUUL products for minors to continue that addiction into adulthood; selling a product that aggravates nicotine addiction; creating advertising to target youth into using JUUL e-cigarettes, and disseminating that advertising through unregulated social media platforms commonly used by youth.

152.     Plaintiffs and class members reasonably relied to their detriment on Defendants' unlawful conduct in that they purchased JUUL not knowing the true propensity of its dangers.

153.     Plaintiffs and the class have sustained damages as a direct and proximate result of Defendants' tortious conduct.

154.     Plaintiffs and class members seek injunctive relief to prohibit Defendants from continuing to engage in the unfair and deceptive advertising and marketing practices complained

of in this complaint.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact.

155.    Pursuant to FDUPTA §§501.211(2) and 501.2105, Plaintiffs and the class make claims for damages, attorney's fees and costs. The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  An order certifying the proposed classes, designating Plaintiffs as the named representatives of the classes, and designating the undersigned class counsel;

B.  An order enjoining Defendants from further negligent, deceptive, unfair, and unlawful conduct as alleged herein;

C.  Awarding actual, compensatory, and consequential damages;

D.  Awarding other monetary and equitable relief for diagnostic testing, medical monitoring, and nicotine cessation programs;

E.  Awarding restitution;

F.  Awarding punitive damages;

G.  Awarding reasonable attorneys' fees, and costs of this case;

H.  Awarding prejudgment and post-judgment interest;

I.  Such other and further relief as the Court deems appropriate under the circumstances.

## **JURY TRIAL DEMAND**

Plaintiffs hereby demand a jury trial on all issues so triable.


Dated: April 15, 2019                                    Respectfully submitted,

                                                         s/Scott P. Schlesinger
                                                         Scott P. Schlesinger (FBN: 444952)
                                                         Jonathan R. Gdanski (FBN: 0032097)
                                                         Jeffrey L. Haberman (FBN: 98522)
                                                         SCHLESINGER LAW OFFICES, P.A.
                                                         1212 SE Third Avenue
                                                         Ft. Lauderdale, FL 3316
                                                         Tel: 954-467-8800
                                                         scott@schlesingerlaw.com
                                                         jgdanski@schlesingerlaw.com
                                                         jhaberman@schlesingerlaw.com